UNITED STATES v. SOUTHERN PAC. CO.

(District Court, D. Oregon. April 1, 1907.)

No. 4,814.

1. RAILROADS—INTERSTATE COMMERCE—EQUIPMENT OF CARS—SAFETY APPLIANCE ACT.

Where, in a prosecution of an interstate carrier for violating the safety appliance act, in that the chains connecting the coupler lock pins to the uncoupling levers were broken or entirely missing, it was no defense that there were other defects in the car, and that it was therefore impracticable to repair the defects complained of without sending the car to the shops.

2. SAME—ASCERTAINMENT OF DEFECTS—NEGLIGENCE.

In a prosecution of an interstate carrier for violating the safety appliance act in operating a car on which the coupler chains were either broken or missing, it was no defense that the car was moved by defendant without knowledge of the defects.

3. SAME—PLACE OF REPAIRS.

Where a freight car engaged in interstate traffic was defective when transported by defendant, in that the coupler chains were either broken

154 F.—57

or missing, such defect being capable of being readily repaired or replaced at any stage in the journey without serious inconvenience or delay, the carrier was not entitled to delay the repairs until after the car had been taken to terminal yards for unloading, nor was it entitled to transport the car a considerable distance to its car shops to make the repairs.

[Ed. Note.—Duty of railroad companies to furnish safe appliances, see notes to Felton v. Bullard, 37 C. C. A. 8.]

## On Demurrers to Answers.

Action in two counts, instituted under the safety appliance act of Congress, to recover the penalties prescribed for a violation of the act. The first count charges the defendant with having hauled Union Pacific car No. 11,147, loaded with coal, while being used in moving interstate traffic, from East Portland in the state of Oregon to Portland in said state, when the coupling and uncoupling apparatus on the A end and the B end of said car was out of repair and inoperative, the chain connecting the lock pin or lock block to the uncoupling lever being broken on the A end of said car, and the chain connecting the lock pin or lock block to the uncoupling lever being missing from the B end of said car. The second count is the same as the first, except it charges that the chain connecting the lock pin or lock block on the A end of the car only was missing. The separate answer to the first cause alleges that the Oregon Railroad & Navigation Company delivered the car to the defendant at the latter's station in East Portland, and that defendant then moved the same with its switch engine across the Willamette river and into the terminal yards of the Northern Pacific Terminal Company, so that it could be unloaded and then carried by defendant over its own tracks, a distance of 13,150 feet, to its car shops, and there properly repaired. It further alleges that the car had thereon the following defects: 1 major lock block broken, 2 yoke rivets, 8 carry iron bolts, 1 brake beam safety chain tightened, and 1 uncoupling lever chain missing, the latter item of which was commonly called an interstate commerce defect; that while said car was thus out of repair, without the knowledge or fault of the defendant, it was moved as aforesaid; "that this defendant did not then and there have at said terminal yards or elsewhere than at its said car shops as aforesaid any place for the convenient and orderly repair of said car, and that it was and is impracticable to refuse to receive said car so loaded as aforesaid and so defective as aforesaid from said Oregon Railroad & Navigation Company at said East Portland station, and it was then and there impracticable to repair said car at any other place or time excepting at its said car shops as aforesaid, and until the said car was then and there unloaded of its contents so received as aforesaid." The separate answer to the second cause is the same as that to the first, except it is alleged that the car had thereon the following defects: 1 yoke rivet, 2 draft springs, 1 brake staff bent, 1 brake beam safety chain tightened, and 1 uncoupling lever chain missing. The sufficiency of the answers in statement of fact is challenged by demurrer.

Wm. C. Bristol, U. S. Atty.
Wm. D. Fenton, for defendant.

WOLVERTON, District Judge. Briefly stated, the conditions under which the cars in question were moved by the defendant railroad company are as follows: The line of the Oregon Railroad & Navigation Company enters Portland from the east. Its junction with the Southern Pacific is at the latter's station in East Portland. The former company owns and operates repair shops on the east side of the Willamette river, distant from the junction approximately one mile; and the Southern Pacific Company likewise owns and operates car shops on the same side of the river, two miles distant. The cars in question were taken up at the East Portland station, carried to and across the steel bridge spanning the Willamette river and into the

terminal company's yards, a distance of about one-half mile, and there delivered to the latter company. It is on account of this act of carrying the cars·from the East Portland station into the terminal yards that the Southern Pacific Company is charged with an infraction of the safety appliance act. The defense is that it was impracticable for the Southern Pacific Company to do otherwise than it did in the way of getting the cars to its car shops, where the designated defects could be properly repaired. The question presented is whether such a defense can be maintained.

It should be noted that the government is not complaining of any defects other than one broken and two missing uncoupling lever chains. The defendant was not called upon to answer except as to these. The additional defects shown by the answer are set up, no doubt, to indicate the necessity of sending the cars to the repair shops before the repairs could be made. The answer does not say that it was impracticable to repair the defects complained of without sending the cars to the repair shops, but to repair the cars in respect of the combined defects which the answer itself discloses. This is an evasion of the real issue. A combining of other car defects with the defects complained of can afford no excuse for delaying the repairs requisite to a compliance with the law; and for this reason alone the answers are wholly insufficient. However, the case has been presented as if the allegations of the answers were confined to the defects complained of, and it is upon this hypothesis that I will determine the controversy.

Some observations preliminarily. The specific purpose of the safety appliance act is pertinently voiced by its title, as follows: "To promote the safety of employés and travelers upon railroads." So the Supreme Court of the United States has said:

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers." Johnson v. Southern Pacific Co., 196 U. S. 1, 17, 25 Sup. Ct. 158, 161, 49 L. Ed. 363.

So in Voelker v. Chicago, M. & St. P. Ry. Co. (C. C.) 116 Fed. 867, the court says:

"The statutory requirement with respect to equipping· cars with automatic couplers was enacted in order to protect railway employés, as far as possible, from the risks incurred when engaged in coupling and uncoupling cars."

In further interpretation of the act, the duty of the transportation companies has also been ascertained:

"When companies, like the defendant in this case," says the court in Voel·ker v. Chicago, M. & St. P. Ry. Co., supra, "are engaged in interstate traffic. it is their duty, under the act of Congress, not to use, in connection with such traffic, cars that are not equipped as required by that act. This duty of proper equipment is obligatory upon the company before it uses the car in connection with interstate traffic, and it is not a duty which only arises when the car happens to be loaded with interstate freight."

And Judge Whitson, in United States v. Great Northern Ry. Co. (D. C.) 150 Fed. 229, has carried the duty to the keeping of the equipment in suitable repair for use as designed by Congress. See, also, P. & R. Ry. v. Winkler, 4 Pennewill (Del.) 387, 56 Atl. 112. The utility of the act requires as much. Otherwise, it would prove to be of but little practical consequence.

Now, it is urged that the cars were so moved by the defendant company without knowledge of the defects, and that that fact ought to relieve it from liability. This is resting the case upon the degree of diligence observed by the defendant company in ascertaining the fact of the existence of the defects. But the proposition cannot be maintained. The very question has been decided by Humphrey, District Judge, in United States v. Southern Ry. Co., 135 (D. C.) Fed. 122, wherein he says, with cogency and force:

"The defendant asks the court to hold, in effect, that they cannot haul the car in that condition, provided they have failed to use diligence to discover its defective condition, but that, if they have used due diligence, they may haul the car in its defective condition. In all such cases it would be impossible for the officers of the government to determine in advance whether a statute has been violated or not; but, before a prosecution could be properly instituted, they should go to the defendant company, ascertain what care it had used in regard to a certain car, determine as a matter of fact and law whether the acts of the defendant constituted due diligence, and from that determine whether a prosecution might be safely instituted. It is evident that such a defense would take the very life out of the act in question, and render its enforcement impossible except in a few isolated cases."

And it was specifically held that due diligence in keeping the coupler in proper repair was not an element of defense.

If such an act was not cause for defense in that case, lack of knowledge that the apparatus was defective would not constitute a defense in this. The railroad companies are charged, as I have shown, with the duty of hauling only such cars as are provided with automatic couplers in suitable repair, so as to be operative without the necessity of employés going between the cars; and it would go far to subvert the law, and the purpose thereof, if they were permitted to say that they had no knowledge of the defect, and that therefore they were not liable under the act. The companies must ascertain for themselves, and at their peril, whether or not they have taken up or are hauling cars with defective couplers. Their intention to do right does not relieve them. United States v. Great Northern Ry. Co., supra. I hold, therefore, that want of knowledge of the defects on the part of the defendant company does not constitute a defense.

The next question is whether the defendant company should have made the repairs before hauling the cars across the river and into the terminal yards. There are here two phases of the question. One involves the condition that the couplers were capable of repair, in the respect that the law requires, without the necessity of taking the cars to the repair shops. If they were, there can be no further contention, because it would surely follow that the defendant should have repaired the defects before moving the cars further upon their journey. I say further upon their journey, because the cars were yet in transit; the point of destination had not been reached; nor was it reached until they were set in at the place of unloading. The chain coupling the lock pin with the lever, is a very simple device, consisting of a few links of a small chain, easily attachable with the aid of light tools, and there exists no reason why it should not be readily repaired or replaced at any stage in the journey without serious or material inconvenience or delay.

But if I am in error as to the fact of the readiness with which the repairs can be made, then the other phase of the question arises, which is, whether the cars should have been taken to the car shops for repair before being carried to the terminal yards for unloading. It is urged that the court should take into consideration the convenience and practicability of repairing the defects. To be understood, it should be said that the term "impracticable" is not employed in the answer to indicate that it was impossible to set the cars out and take them to the repair shops before carrying them on their journey; but that it was impracticable so to do, in the sense that it would unduly impede and interfere with the transportation of freight by cars, and in special instances might result in loss to either the shipper or carrier, or to both, as in the case where perishable goods were being transported. While Congress may have taken into consideration, and presumably did, the inconvenience to railroad companies in providing equipment of the character here under consideration, and in keeping the same in repair, yet by its positive enactment it manifestly considered the safety of the brakemen and employés who are charged with the duty of coupling and uncoupling cars paramount; and, having made no exception in terms, the natural conclusion is that the act was intended to apply in all cases where the cars were being used in moving interstate traffic. Admittedly, if a breakage occurs between stations where repair shops are located, and the repair cannot be made without taking the car to such a place, the company cannot be held liable until it has had the opportunity of making the repair, and in that event it would be justified in hauling the car in the train to the succeeding station where such repairs could be made. This does not, however, give to the company the discretion of carrying the car forward to repair shops at destination. If it were permissible to carry the car by one repair shop to another, where the repair could be more conveniently made, then it could, with equal propriety, be claimed that the car might be carried by and beyond two or more of such stations, and, indeed, to cover an entire journey from the Middle West to the Pacific seaboard. This would detract vitally from the utility of the law, as brakemen might, in the course of such a haul, be required to pass many times between the cars for the coupling and uncoupling of the particular car or cars with defective equipment. An illustration is afforded by what was done in this case. After the cars were taken into the terminal yards, it was necessary to uncouple them to set them out for unloading, and to couple them again for transportation to the Southern Pacific Company's car shops, with possibly other couplings and uncouplings to be made. So that the danger to the brakeman continued, and must needs have continued, until relieved by the proper repairs being made. I am constrained to the view, therefore, that this is just the danger that Congress intended to relieve against by the adoption of the act, and that it is what the defendant's duty required it to relieve against by making the repair of the defects prior to taking the cars into the terminal company's yards. The shortness of the haul does not alter the case. We may suppose that a defect existed while the car was being carried from beyond The Dalles, where the Oregon Railroad & Navigation Company has repair shops. It would have been a violation of the act for that company to have hauled the

cars from The Dalles to Portland without correcting the defect; and so it is, in like manner, a violation of the act for the Southern Pacific Company to take up the cars at East Portland and haul them for the distance of only a half mile, and there deliver them to a company whose duty it is to transact terminal business, where the chief work is in shifting cars from one train to another, and a vast amount of coupling and uncoupling is done, and the greatest danger is present. To hold otherwise would defeat in large measure the paramount purpose and object of the law.

The demurrers to the answers should therefore be sustained, and it is so ordered.